**FOURTH DIVISION**
**DILLARD, C. J.,**
**RAY, P. J., and SELF, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**August 8, 2017**

# In the Court of Appeals of Georgia

A17A0677. WOODWARD v. THE STATE.

RAY, Judge.

Dontavious Woodward was indicted on two counts of aggravated assault-family violence (OCGA § 16-5-21)[1] and a separate count of arson (OCGA § 16-7-60). A jury found Woodward guilty of arson and of the second count of aggravated assault-family violence. Woodward appeals from the denial of his motion for new

---

[1] In rendering this opinion, we rely upon the version of the statute in effect at the time the crimes were committed in March 2010. See OCGA § 16-5-21, Laws 2006, Act 571, §4, effective July 1, 2006. The statute has since been amended several times, though the sections pertinent to this opinion remain unchanged.

trial, contending that the evidence was insufficient to support the verdict. For the reasons that follow, we affirm.

On appeal of the sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution to discern whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 S. Ct. 2781) (1979).

The evidence adduced at trial showed that Woodward, who was 17 years old, lived in a two-story house in DeKalb County with his mother, his step-father, and his four younger siblings. At about 11:00 p. m. on March 28, 2010, as the family was getting ready for bed or had gone to bed, Woodward's parents and siblings heard a loud crash from Woodward's bedroom followed by the smoke detector going off. When family members came out of their rooms, they saw fire coming from Woodward's bedroom. The floor was on fire, and Woodward was laughing.

Woodward was setting things on fire with a grill lighter and with an aerosol spray can he was using as a torch to set the walls, floor, and his bed alight. Family members also saw him setting the couch afire. Woodward's burning stereo or television was lying on the floor of his bedroom, and his window blinds were on fire.

Using his makeshift torch, Woodward was shooting flames "three feet" out toward his family, saying "Get back, nobody come in here," although he forced one of his younger siblings back into the room. No one had threatened Woodward in any way. Woodward's parents eventually got the younger children out of the house, but when his step-father tried to get Woodward to leave, Woodward would use his "man-made torch" with lighter fluid that he would light and would "spray [his step-father] back" while laughing. He told his step-father, "I only want you."

After the rest of the family had evacuated, his step-father ran back to the house to try to get Woodward to leave. Woodward had locked the door, and his step-father used a key to get back in. Eventually, Woodward came out. Though accounts differ,

3

testimony showed that Woodward began walking toward his step-father's car with the lighter and spray can in his hands. One of the siblings and the step-father testified that they believed Woodward intended to set the car on fire.

The step-father had at some point picked up a hand-weight or dumbbell, and he began walking or running toward Woodward to fend him off. However, he dropped the dumbbell and did not strike Woodward with it. Woodward struck his step-father on the head with the spray can. After his step-father had dropped the dumbbell, Woodward then ran at his step-father with a knife in each hand, saying, "I'm gonna kill you[,]" and stabbed him multiple times. Family members saw a "knife going up and down." One of Woodward's siblings testified that, earlier in the evening, she had seen Woodward put kitchen knives in his pocket.

Eventually, Woodward was subdued by family members until firefighters came on the scene. His mother took one of the knives from him, and firefighters took the others. Woodward was arrested, but even after being restrained by law enforcement,

4

he continued laughing and smirking. Woodward was uninjured, but his step-father was bleeding heavily from knife wounds and was transported to the hospital for treatment.

1. Woodward argues that the evidence was insufficient to sustain his conviction for aggravated assault-family violence. He argues that the State failed to disprove his contention that he was acting in self-defense. We disagree.

When a justification defense has been raised, the State's evidence must be sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Woodward did not act in self-defense. *Noble v. State*, 282 Ga. App. 311, 312 (638 SE2d 444) (2006). This Court does not weigh the evidence or determine the credibility of witnesses, as that is the function of the jury. This Court will sustain a jury's verdict if there is competent evidence, even if contradicted, to support that verdict. *Waller v. State*, 267 Ga. App. 608, 608 (600 SE2d 706) (2004).

The count of the indictment under which Woodward was convicted charged him with injuring his step-father by stabbing him with a knife. OCGA § 16-5-21 (a) (2) provides that "a person commits the offense of aggravated assault when he or she assaults . . . [w]ith a deadly weapon or with any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury[.]" In order to prevail on a justification defense, the person who is claiming self-defense must not have been the aggressor. OCGA § 16-3-21 (b) (3).

Woodward argues that he presented evidence that he acted in self-defense, that his step-father was armed with the dumbbell and followed him outside, and that he defended himself because he thought he was in imminent danger. He testified that he hit his step-father with the spray can because his step-father chased him out of the house, and that when his step-father charged him again with the dumbbell, he used a knife to defend himself. As outlined above, however, there was conflicting evidence

6

indicating that Woodward stabbed his step-father only after his step-father had dropped the dumbbell.

Whether the State has met its burden of proof that Woodward was the aggressor and not entitled to a justification defense was for the jury, *Noble*, supra, as was the resolution of conflicts in the evidence. *Waller*, supra. Woodward's evidence conflicted with the State's evidence, as outlined above, which showed that Woodward was the aggressor in using a knife as a deadly weapon to injure his step-father. We find that the evidence was sufficient. See *Hazelwood v. State*, 265 Ga. App. 709, 710 (595 SE2d 564) (2004) (finding the evidence sufficient to uphold defendant's conviction for aggravated assault where jury believed the victim's story regarding how a stabbing occurred instead of the defendant's version of events).

2. Woodward also argues that the evidence was insufficient to support his conviction for arson in the first degree because the State failed to disprove his defense that he accidentally started the fire. Again, we disagree.

OCGA § 16-7-60 (a) (5) states that "[a] person commits the offense of arson in the first degree when, by means of fire or explosive, he or she *knowingly damages* . . . [a]ny building . . . under such circumstances that *it is reasonably foreseeable that human life might be endangered*." (Emphasis supplied).

Woodward alleges that the evidence failed to show that he intentionally started the fire. He argues that he started the fire accidentally when he fashioned a make-shift flame-thrower out of curiosity, based on things he had seen at the circus or on his computer, using a lighter and an aerosol spray can to project a flame which accidentally set fire to a paper shopping bag filled with trash.

It is true that there is a presumption that "any fire is a result of accident and providential cause rather than criminal design." *Frost v. State*, 200 Ga. App. 267, 270 (3) (b) (407 SE2d 765) (1991). The State bears the burden of overcoming this presumption by proving "from either direct or circumstantial evidence, beyond a reasonable doubt, that the fire was of incendiary origin and that the defendant was the

guilty party." (Citations omitted.) Id. Moreover, "[a] person will not be presumed to act with criminal intention but the trier of facts may find such intention upon consideration of the words, conduct, demeanor, motive, and all other circumstances connected with the act for which the accused is prosecuted." OCGA § 16-2-6.

However, pretermitting whether the very first spark was initiated by accident or design, the evidence and testimony, as outlined above, certainly supports the conclusion that Woodward intentionally used his makeshift flame-thrower to start additional fires in his home which he must have known would cause damages. Family members testified that, after they initially saw flames issuing from Woodward's room, they saw him using the makeshift flame-thrower to, among other things, start additional fires on the walls and sofa. The State's fire investigator testified that the damage caused to the house was consistent with that of fires set by a blow torch, and a detective from the police department testified that the whole top portion of the

house was on fire. The fire caused smoke damage, melted the eaves of the house, and burned the roof and Woodward's bedroom floor.

The State's evidence was sufficient to disprove Woodward's claim of accident. The State showed that he set fire to the walls and the sofa and, pursuant to OCGA § 16-7-60 (a), "knowingly damage[d]" the building in which he lived, while his family was in upstairs bedrooms near where he was setting fires. As outlined above, it was "reasonably foreseeable that human life might be endangered." OCGA § 16-7-60 (b).

*Judgment affirmed. Dillard, C. J., and Self, J., concur.*