**SECOND DIVISION**
**MILLER, P. J.,**
**BROWN and GOSS, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**February 7, 2019**

# In the Court of Appeals of Georgia

A18A1832. JOHNSON v. THE STATE.

BROWN, Judge.

A jury found Marquis Johnson guilty of aggravated assault and criminal damage to property in the second degree. In this appeal, he contends that the trial court erred by denying his request to charge the jury on the lesser included offense of simple assault and that the evidence was not sufficient to support his conviction for aggravated assault. For the reasons explained below, we disagree and affirm.

On appeal from a criminal conviction, the standard for reviewing the sufficiency of the evidence

> is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. This Court does not reweigh evidence or resolve conflicts in testimony; instead, evidence is reviewed in a light

most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence.

(Citations and punctuation omitted.) *Hayes v. State*, 292 Ga. 506 (739 SE2d 313) (2013). So viewed, the record shows that the charges against Johnson arose from an argument with his stepfather. It began when the stepfather denied Johnson's second request to use a car to drive to a college class instead of his mother or stepfather driving him and dropping him off. The stepfather testified that "things got out of hand" when he told Johnson again that he could not use the car, and the stepfather admitted that he could have handled the situation better. At some point during the altercation, the stepfather walked up the street because he was upset and needed to "cool off." At this point, no physical altercation had taken place.

As the stepfather walked back toward his house, Johnson's mother yelled for him to bring the car keys. The stepfather described what happened next in the following ways:

When I came back, I lunged at – went at my car, he thought I was coming at him, that's when my wife got bumped, she hit against her car, and so – she was upset and he saw that, and that's when he ran in the house.

. . .

2

That's when he thought I was lunging at him and his mother and that's when he got defensive, and that's when she hit . . . the car because I came up, going to give her the keys and get in my car and just go, and then he saw me bump his mother and that's when he reacted.

. . .

What I did, I walked down here, he was standing – him and his mother was standing right there by the doorway, then they walked towards the car, she said just give me the keys, and I went at her like this here (demonstrating), he was standing there and I bumped him. That's when he ran in the house because he thought there was going to be a physical altercation.

When Johnson returned after going inside the house, he was holding a knife in each hand. Johnson did not lunge at his stepfather or try to cut him; "he just held the knives up." The stepfather testified that Johnson "never got closer than ten feet" to him. After Johnson came outside with the knives, the stepfather ran across the street and picked up a stick of quarter round molding lying outside a neighbor's garage to defend himself in case Johnson came close to him with the knives. While the stepfather was running across the street and had his back turned, Johnson smashed the windshield of his stepfather's car. After the stepfather picked up the stick, both men were screaming and yelling, with the stepfather telling Johnson to "put them

knives down" and Johnson asking the stepfather to "fight me like a man." At one point, the stepfather put the stick down and told Johnson, "[L]ook, I'm not going to do anything to you, put the knives down," but Johnson refused and continued to shout "fight me like a man." The stepfather testified at trial that he was "[a]t no time . . . in fear for my life, I was just getting something to protect me. . . . Just in case he got any closer so I can, you know, ward it off."

The State established during the stepfather's testimony at trial that his recollection of the events changed after he initially spoke with the police. The stepfather told the police that Johnson smashed the windshield before he went into the house to get the knives, that Johnson chased him with the knives, and that he feared for his life "because of the simple fact that he got two knives and . . . I have a stick, so I know that stick ain't going to protect me, so any ordinary person would have been in fear."

In his initial statements, the stepfather said nothing about pushing the mother or Johnson before Johnson obtained the knives. In later conversations with the district attorney's office, the stepfather stated that his wife was threatening to make false reports to get him in trouble and make it look like he had been the aggressor. After they later resolved their differences and "got back together," the stepfather asked the

4

district attorney's office to drop the charges. Four days before the start of trial, the stepfather signed an affidavit stating for the first time :

> I actually charged at Mr. Johnson[.] His mother had to stand between us. I was very stressed and I could have handled this matter differently. Mr. Johnson simply wanted to drive to his class that night and that was it. [Johnson] wanted to find a job. He was stressed as well.

Later in his testimony, the stepfather clarified that he had no independent recollection of bumping his wife at the car; that he testified that he had done so based upon what she and other neighbors told him.

A neighbor testified that he saw the stepfather walking fast toward his garage with Johnson "running across the street with two large butcher knives in his hand[s]." He testified that the closest he saw the two men together was when "one was on one side of my truck and the other was on the other side of my truck." The neighbor was startled by the sight of Johnson charging with the knives and closed his garage door before calling the police. In a written statement provided to the police, the neighbor stated "that [Johnson] backed up and [the stepfather] put the stick back."

When the first officer responding to the report of a fight in progress arrived, he saw Johnson in the middle of the street holding a large knife in his right hand. His mother was "physically restraining him and yelling at him to drop the knife," and

Johnson was screaming "fight me like a man." The officer saw the stepfather "standing two driveways down" from Johnson, and the stepfather was "not verbally engaged, he's just standing there being complacent." When the officer got out of his car, he ordered Johnson to drop the knife; Johnson ignored the command and "tried to push back through the female as if he was going after the second male." The officer then drew his gun and ordered Johnson to throw the knife into the yard. After Johnson did so, the officer placed him in handcuffs and physically pulled him to the back of his car because Johnson was still yelling at his stepfather to "fight me like a man."

The mother testified that the stepfather was in a rage after Johnson asked to use the car. When he returned from walking down the street, he was still in a rage and lunged at and tried to hit Johnson. At some point during or after the mother placed herself between the stepfather and Johnson and wrestled the stepfather to the ground, Johnson went inside the house. She acknowledged that Johnson came out of the house holding the knives, but denied that Johnson chased the stepfather. She denied that her son was ever close to the stepfather while he was holding the knives. She admitted that she did not initially tell the police that the stepfather was in a rage and that she ended up on the ground after the stepfather lunged at Johnson.

Johnson testified that when his stepfather returned after walking down the street, "he went from a walk to a full run, a full burst of running" and his mother "jumped up and she actually tried to create a barrier between him and whatever he wanted to do." When it appeared that his stepfather would break through his mother's barrier, he ran into the house because he believed she was in danger. He saw her falling as he grabbed the doorknob and looked back. He grabbed knives from the kitchen and returned outside. He saw his mother on the ground and placed the knives in his pocket. When the stepfather told him that he would destroy him, he took the knives back out again, and the stepfather went across the street and picked up the stick. Johnson admitted following his stepfather across the street at a distance to make sure he did not come back with a weapon. Johnson testified that he never tried to cut or stab his stepfather with a knife.

The indictment alleged that Johnson committed aggravated assault because he "did knowingly make an assault upon the person of [the stepfather] with a knife, an object which when used offensively against a person is likely to result in serious bodily injury. . . ." The trial court denied Johnson's request to charge the jury on simple assault as a lesser included offense based upon its view that the evidence regarding the knife removed the issue of simple assault from the case. It granted his

request for a charge on justification. Consistent with the State's request to charge, the trial court instructed the jury on aggravated assault based upon only one of the two methods for committing simple assault; specifically, "that [a] person commits an act that places another in reasonable apprehension of immediately receiving a violent injury." See former OCGA § 16-5-20 (a) (2).[1] It also charged the jury extensively on justification and self-defense. At the conclusion of the trial court's charge, Johnson's counsel excepted to the trial court's failure to charge on simple assault as a lesser included offense.

1. Johnson contends that the trial court erred by denying his request to charge on the lesser included offense of simple assault. His contention rests upon the indictment's failure to specify which type of simple assault he committed as the predicate for aggravated assault with an object likely to result in serious injury when used offensively against a person. See OCGA § 16-5-21 (a) (2) (defining particular aggravated assault alleged by State in the indictment). It is well-established that "[a]ggravated assault has two elements: (1) commission of a simple assault as defined

---

[1] In this opinion, we reply upon the version of the statute in effect at the time Johnson committed the crimes in August of 2013. See Ga. L. 2011, p. 752 §16, effective May 13, 2011; *Woodward v. State*, 342 Ga. App. 499, n. 1 (804 SE2d 153) (2017).

8

by OCGA § 16-5-20 (a) (5); and (2) the presence of one of three statutory aggravators" set forth in OCGA § 16-4-21 (a). *Patterson v. State*, 299 Ga. 491, 492 (789 SE2d 175) (2016) (*Patterson II*). "A person commits simple assault when he or she either: (1) Attempts to commit a violent injury to the person of another; or (2) Commits an act which places another in reasonable apprehension of immediately receiving a violent injury." OCGA § 16-5-20 (a).

Relying upon this Court's decision in *Harris v. State*, 342 Ga. App. 829 (805 SE2d 281) (2017) (physical precedent only), Johnson asserts that the evidence would have supported a charge for one type of simple assault as a lesser included offense of aggravated assault. In support of this assertion, Johnson points out that an assault based upon an attempt to commit a violent injury to the person of another, OCGA § 16-5-20 (a) (1) is a specific intent crime, whereas an assault based upon committing an action which places another in reasonable apprehension of immediately receiving a violent injury, OCGA § 16-5-20 (a) (2), is one of general intent. See *Patterson v. State*, 332 Ga. App. 221, 223-228 (2) (a) (770 SE2d 62) (2015), affd. by, *Patterson II*, supra, 299 Ga. at 492-496. In his view, the evidence would have authorized the jury to conclude that he "intended to commit a violent injury but not with the use of knives."

We find no merit in Johnson's argument based upon the particular facts of this case. The trial court did not charge the jury on both types of simple assault. Instead, as it was authorized to do where, as here, an indictment alleges alternative means of committing a crime, the trial court charged on only one form of simple assault as the predicate for the aggravated assault charges. See *Cash v. State*, 297 Ga. 859, 861-863 (2) (778 SE2d 785) (2015); *Lopez v. State*, 260 Ga. App. 713, 716 (3) (580 SE2d 668) (2003). Based upon the trial court's decision to charge the jury on aggravated assault based only upon the general intent type of simple assault embodied in OCGA § 16-5-20 (a) (2), Johnson's argument that the trial court erred by failing to charge the jury on the alternative form of simple assault as a lesser included offense has no merit.[2] Based upon the particular form of aggravated assault alleged in the indictment and charged to the jury, the evidence showed that Johnson was either guilty of aggravated assault or not guilty by reason of justification. See *Hudson v. State*, 296 Ga. App. 692, 695 (2) (675 SE2d 578) (2009); *Gross v. State*, 312 Ga. App. 362, 364-365 (2) (718 SE2d 581) (2011). Accordingly, the trial court did not err by denying his request for a charge on simple assault as a lesser included offense.

---

[2] We express no opinion about whether Johnson's argument would have succeeded if the trial court had charged the jury on both forms of simple assault.

10

2. We find no merit in Johnson's argument that the State "failed to prove each element of aggravated assault and to disprove the affirmative defense of justification beyond a reasonable doubt." The State's evidence showing that Johnson chased the stepfather while holding the knives was sufficient to support his conviction for aggravated assault. *Gunter v. State*, 316 Ga. App. 485, 486-487 (1) (729 SE2d 597) (2012). "The question of [Johnson]'s justification was for the jury to determine, and it was free to reject [his] version of the events, which obviously it did." *Mosley v. State*, 300 Ga. 521, 524 (1) (796 SE2d 684) (2017).

*Judgment affirmed. Miller, P. J., and Goss, J., concur.*